Case number 15-3496, USA v. Gary Wymer. Case number 15-3510, USA v. Terrence Wymer. Case number 15-3511, USA v. Gary Wymer Jr. Case number 15-3512, USA v. Robert DeBolt Jr. and Case number 15-3513, USA v. John DeBolt or arguments to be. 30 minutes to be shared by the defendant's appellants. 30 minutes for the plaintiff. Mr. Dennis Belli for the defendant, appellant Gary J. Wymer. That's a lot of enthusiasm for a Friday morning. Yeah, I'm already a little excited. Dennis Belli, counsel for Gary Wymer Sr. I can speak on behalf of all counsel that we each reserve one minute of rebuttal time. I assume you've divided this up among yourselves. Yes, equally. Six minutes a piece. Gary Wymer Sr. is unique among the appellants in that he is appealing his conviction for conspiracy to transport stolen motor vehicles. Actually, it's a four-part conspiracy. Our argument regarding sufficiency is not based on the suggestion that Gary Wymer Sr. is innocent of criminal conduct. Our position is that his conduct amounted to aiding and abetting the principal offender and not conspiracy. While there's not a lot of law on this subject, the case law does draw a distinction. Conspiracy, as the court knows, is an agreement to commit a crime. Aiding and abetting is giving substantial assistance to another individual to commit a crime, even if the defendant does not agree to join in the criminal scheme. How do you suggest that that line be drawn? On a case-by-case basis. There's no Sixth Circuit, at least no published opinions, dealing with this in the criminal context. Doesn't an aider and abetter get the same sentence as a person who's aiding and abetting? Yes, but our position would be that Gary Wymer Sr. was not charged with aiding and abetting, which is a separate crime. Therefore, if the court agrees with our theory, the conspiracy conviction gets thrown out and there is no sentence. Because he's only charged and convicted of one count. If we look at this on a case-by-case basis, as you're suggesting, it seems beyond dispute that he did a lot of things in connection with this enterprise. That's right, and that's why I indicated that he's guilty of something. So to suggest that he wasn't basically part of this agreement that his brother had just seems sort of hard to believe. So what is missing here in terms of all this involvement that you think is essential to show that he was a member of the conspiracy? Well, the conspiracy has four objectives. Transport stolen vehicles, transport stolen property, steal property in interstate commerce, and possess stolen property taken in interstate commerce. And Wymer Sr. did not share in any of those objectives. The facts show that at a certain point in time, I think it was in 2012, Michael Wymer, who operated a chop shop, I believe it was on Sterling Street, his chop shop couldn't handle all the vehicles that his operation was stealing. So for a five-week period, I think it was November, December 2012, he sent some of the vehicles to my client's salvage yard. And there's testimony from a prosecution witness that Wymer Sr. operated a legitimate salvage yard at this Consult Street location. So these vehicles, about seven out of 24 that were stolen by Michael Wymer, were brought to my client's salvage yard and dismantled, and ultimately the property was sold for scrap. And that certainly constitutes substantial assistance, but it doesn't constitute joining in the operation, the agreement of Michael Wymer and his cohorts. He enlists his son to take some of this material to the scrap yards. He helps Diebold transport stolen aluminum to Pennsylvania. And he actually goes to his brother's facility to perform actions there, too. Well, I'm not sure that he... he was at his brother's facility, but I'm not aware of any evidence showing that he did anything there. Michael Wymer's son testified that he came to the sterling facility and obtained stolen items and cargo loads from stolen trailers. That's what I believe the testimony is. And I think that's consistent with our argument that this was confined to this five-week period when Michael Wymer was experiencing overcapacity problems at his chop shop. How much money did he make? There is no testimony regarding that. And my time is up. Let's do it out of the goodness of his heart. Thank you. And may I please the court, Thomas Kirkford, Terrence Wymer. As this court knows, this case involved a rather brazen scheme to operate a chop shop and to steal vehicles. The scheme was put in place by Michael Wymer Sr. and a handful of relatives of his age cohort who had been in this business back in the 80s and 90s. In the 80s and 90s, my client, who is the son of one of the people who had been convicted back in the 80s and 90s, was six years old. You fast forward to 2011, and no surprise, my client's got no high school diploma. He's functionally illiterate, addicted to opiates, and almost living on the street. But remarkably, at this point, he has no criminal record. Despite all of this, despite the lack of criminal record in these other situations, the trial court sentenced him to 60 months, the maximum, in prison. In the third part of my brief, I argue that the sentence is substantively unreasonable, that Terrence Wymer should have been given a lower sentence, if not the opportunity to rehabilitate himself. The sentence is within the guidelines? Yeah, and I was just going to say, because it's within guidelines, it's a presumptively reasonable sentence. So what I'm asking the court to do today is to look closely at how those guidelines were arrived at. The guideline range was actually 70 to 87, right? It would have been. But it's trumped by the statutory maximum. Correct. So it gets the statutory maximum. That's the guideline range, correct. So you're saying that the judge had an obligation to depart or vary here? Well, actually, I think... Do you think it's reasonable? I think the district court should have, in terms of just reasonableness. But the argument that I want to concentrate on with the court this morning is that there were two aspects of those guidelines that were incorrectly decided. And had they not been incorrectly decided, the guideline range would have been much lower. It would have been lower than 60 months. It would have been, I think, in the 40s somewhere. I bring to the court's attention two points with respect to the guidelines. The first being the question of the number of victims. There were victims counted who definitely should not have been counted since their losses were not included in the loss total amount. And I've cited several cases to the court indicating that that is simply incorrect. Could I just ask you one further question about substantive reasonableness before we leave that subject? Assuming that the court rules against you on the number of victims argument that you're making... Yes. Do you still have a remaining argument that the 60 months is not substantially reasonable? Well, in terms of the other argument I've made with respect to the guidelines, which is the loss amount total... I want you to assume that you lose on the number of victims and the loss amount total. In other words, is your substantive reasonableness argument, does it hinge upon winning one of these other arguments? No, because, again, it's a guidelines sentence, so it is presumed to be substantively reasonable. I do believe, and I do argue to the court, although I'm not going to belabor it because it's such a tough standard to hit, that this sentence was too high for this particular individual in any event. What's your best case? I mean, that is possible. Well, the best case would be if the court agrees that insurance companies are not victims... Okay, let's assume, as Judge McKeague said, that the guidelines are correctly scored, and this sentence is within the guidelines, but it is only presumptively reasonable. But what's the best case that, under these facts, the district judge abused his discretion by sentencing within the guidelines? Your Honor, it would be a matter for this court to look at this man's situation, this young man's situation. Can you cite other cases where it's somewhat similar to this, that we found an abuse of discretion within the guidelines? I cannot. I'm not saying they're not out there, but I do not approach it from that point. Your main argument is the father got 40 months, he got 60. Well, I think that kind of points something out. But the main argument that I have, honestly, for the court this morning is the guideline calculation.  Thank you. I don't think insurance companies are victims for purposes of victim count. They voluntarily and contractually stand in the exact shoes of the victims themselves, and it's simply piling on, double-counting, to say that these insurance companies are victims. And there's no case law that goes directly to that point, and I think this court should look at it and say, wait a minute, that's not right. The argument is that they're just sort of a... they aggregate premiums and then they pay them back out, but most of them are stock companies. They have shareholders. They try to maximize profits. The system might be good. The system might be bad. But why aren't they victims? Well, because they don't sustain a loss. They don't sustain a loss. Wait a minute. Part of the premiums, they're not going to pay out every dollar in premiums that they take in, are they? Or they're going to be out of business. Right. So they retain some of the premiums that they take in. Pays their expenses, and presumably if they're a stock company, pays the shareholders. If they don't get reimbursed from something like this, then at least the portion that they were going to keep for themselves, they lose, right? Right. Why isn't that a loss? Honestly, I think that's looking at it far too narrowly. If you look at the whole picture of what an insurance company does, they make money. And it's good that they make money. Not all of them. Not all of them do. No, but that's another matter. If they have too many losses, they're going to go out of business. Right. But as a group, they're sophisticated at this. Okay. So you admit you don't have any authority for that? I would say there's no case law on that. All right. Okay. Thank you. Good morning. If it pleases the court, my name is Kenneth P. Kabelman. I'm representing Robert DeBolt. I'm going to focus on really three aspects to this appeal from Mr. Robert DeBolt. This morning I thought I would start with a guideline scoring issue, which is the acceptance of responsibility. My client pled guilty on the eve of trial, and this case was handled in the trial court in kind of a group fashion, much as our appeal was being handled in a group fashion this morning. There were proceedings, and the judge began sentencing the various defendants, and at one point there was a recess. My client went out apparently to smoke a cigarette. I was not trial counsel, but apparently that's what happened. The body of lawyers and clients and judge reassembled, and Mr. Robert DeBolt was not present, and he was about five minutes late. I can understand why your client could be suspicious that the judge's ire when he was late might have carried over, but we have a situation where the court specifically disavowed the earlier statement when he was apparently irritated with your client, and he said that wouldn't play any role in his sentence. So where is there any sort of objective evidence that undercuts what he said? If the court will go back. Well, he did say that, Your Honor, but he'd already made a guideline decision, a guideline scoring decision to deny my client acceptance of responsibility based on my client's tardiness in part. That's where it happened. Sure, he can say at the sentencing, oh, I'm not coming. Regulations say it has to be a timely acceptance of responsibility. Well, of course, and you know with the court. It causes a lot of disruption in the schedule. The judge may very well have had a proper basis to deny acceptance of responsibility. We can't tell on this record because on this record, when my client is late and my client comes up for sentencing, the judge says and lectures him and says, it's the most important date that you've got, it's as important as your wedding date, you weren't timely about pleading guilty, you weren't timely coming here, I'm denying your acceptance of responsibility. That's two points on the guidelines. And sure, he can say later on, well, it doesn't factor into my sentence, but it certainly does because he took away the two points. Now, maybe it's a loser argument setting that aside, but how do we know? Well, let's move back to at the time that acceptance was denied as opposed to the imposition of the sentence at the end. Just reading this, the biggest factor, at least it seemed to be, from the cold record that we looked at, is your client has to fully accept responsibility for everything he did. There's a disparity in what people are saying, so the probation officer asks him to come back in and explain, and he refuses. Kind of a risky move there, wouldn't you say? I don't think it worked well for Mr. DeBolt, no, Your Honor. So why is that not enough upon which for the government to hang a tap that he wasn't entitled to acceptance, whether it was late or not late? Well, I think it's analysis of looking at how do we tell how the judge came to his decision. Let me loop back to where I was. The best you could get would be to send this back for resentencing where the judge explains then more explicitly, presumably, why, if true, he denies acceptance or responsibility. Do we have any reason to believe, objective or otherwise, that the result would be any different here? Based upon the record. I don't know what we can tell from the record what the result would be. So let me... You think he might have an epiphany and he wouldn't get acceptance or something? Or he would get acceptance? I think we're speculating about what would happen because it's a very complicated case and there's other factors that bear on the sentence. Acceptance is an aspect. Another aspect, of course, is my client got an above-guideline sentence, and another aspect is this whole loss calculation. There really wasn't in Mr. Robert DeBolt's case. Let's stop right there. That's interesting to us, trying to divine what a judge did or would have done. Once you have a guideline calculation that, in this case, does not include acceptance, and then there's a variance above that, would that not be a pretty clear indication that the judge would not give him acceptance and or would give him a lower sentence because of the application of acceptance of responsibility? I guess it's some evidence that the judge was thinking that he wanted to punish my client more severely than the guideline suggested. But what did he go up to? He went up to the statutory max. He did, yeah. He did. My client was unique in the sense that he pled guilty to the trial and he had multiple counts of conviction, so he had a much bigger exposure. I'm out of time, but I'll come back on the phone. Thank you. I plead the court, Harry Mijas, on behalf of Mr. John DeBolt. Your Honor, today what I'm addressing is the court's application of foreseeability in determining my client's involvement in the conspiracy for the purpose of the sentencing. I think the court erred in applying a reasonable person standard several times in the transcripts. You see that the court talked about what a reasonable person would see. No matter how small a part of the conspiracy my client may have played, it was reasonably foreseeable for a reasonable person to know what was going on. I think what the court was expressing was its indignation at the loss that these truckers had incurred. But as the court knows, the analysis should have been from an individual defendant's standpoint, from the guidelines 1B.1.3, looking specifically at my client's viewpoint of what was going on. And I think the court failed in doing that. And in doing so, the guidelines went from, could have been as low, somewhere in the 40 months, to the five-year statutory maximum. If I understand what you're saying is you want foreseeability to be determined from the defendant's point of view, but our case law seems to say that it's an objective test. And the Sixth Circuit case that stands for that proposition is Catalan, C-A-T-A-L-A-N. And Cochran. Do you have any response to why those cases don't apply? I think when you look at the other courts, when you look at Spotted Elk, the Eighth Circuit, when you look at Wilkins, the cornerstone of federal sentencing guidelines, we indicate that foreseeability is the ability to see or know in advance. It may be an objective determination, but it's considered from a defendant's viewpoint, not what the reasonable person in general is looking at. Objective means you don't look at the defendant. That's subjective. In some ways, that's what's confusing about the case law. The case law as I've read it indicates that we need to look at it from the defendant's standpoint, yet it wants an objective determination. Here's the problem, just so we can drill down and be clear about this. We're a panel. We can't overturn other panel decisions under our rules. So do you have a way to distinguish Catalan and Cochran, either telling us they don't apply for some reason, or yeah, they're authorities, but they're distinguishable in this case? I think if you look at Sweeney, 203 F. 3rd, 397 F. 402, the scope of the conduct for which a defendant can be held accountable under the sentencing guidelines is going to be... Are you citing a Sixth Circuit case? Yes. What year is that? 2000. It's going to be significantly narrower than the conduct... That's after Cochran, but it's before Catalan. Catalan came along afterwards. I would rely on Sweeney. I understand where the court... Go back. That the scope of the conduct for which a defendant can be held accountable under the guidelines is significantly narrower than the conduct embraced by the conspiracy. I think when you look at that, it gets you back toward that individual and viewing what the individual has done, even objectively, looking at and saying... Let's assume that you're right. Your guy's what's referred to as the torture in this operation, right? Correct. And the evidence seems to suggest that he was involved in the dismantling or obscuring the identification of virtually all of these thefts. No. I disagree with that. I think there were about three or four instances as cited in the pre-sentence investigation that conclusively said that he was involved in torturing, and even the judge said, however occasional or however infrequent. Well, Greg Rose testified, as I understand it, that he and your client were inseparable, and every time Michael Weimer stole trucks and trailers, that he and your client came to the shop and they cut them up and processed them. I appreciate what Mr. Rose had to say, but the court says that in his determination of relevant conduct, it's a value-cost conspiracy, which was foreseeable on your part, given the role you were playing. However occasional, however infrequent. I don't think the court agreed with Mr. Rose or found what Mr. Rose said as convincing. The court, in sentencing my client, admitted that my client's profit from this was minimal, that his role in this was minimal, but still said that... He didn't say the role was minimal. He said that he was directly and significantly involved, and he said, quote, without anyone to dismantle the trucks, the operation couldn't have gone forward. It's as simple as that, end quote. Pretty strong statement. Right. And yet I'm looking at transcript 531, page ID 6552-54, however occasional or however infrequent. The judge contradicted himself in saying that, because I mean he acknowledges at this point that my client's role is infrequent and occasional, and other testimony indicated that, that my client wasn't there all the time and certainly didn't profit from this. And those are factors that should have... He's part of the conspiracy. What's that? Is there any question about he's part of the conspiracy? I think from a criminal Pinkerton evaluation? No. But when you come back... If he's part of the conspiracy, then the question becomes is he reasonably responsible for other actions of other conspirators. He knew what the operation was. Let's assume he wasn't there, and he wasn't the torturer on every one of the trucks. There's no suggestion that he didn't know what the other conspirators were doing on the occasions when he didn't cut them up, right? I think when you're dealing with... When you're looking at these individuals, as Mr. Kurtz said, my client has an 8th grade education, living at a subsistence level, who was called on occasion by his uncle to come and do work. My client comes, does his work, leaves, doesn't ask. Mr. Weimer, about his business, doesn't ask. Is it unusual that they're cutting trucks up into little pieces? To an extent, but when we're getting into you're cutting up trucks into little pieces, that doesn't necessarily impute on my client that he knows the scope, the vast scope of the conspiracy. If he comes in a few times infrequently, however infrequent and however occasional the judge says, that doesn't mean that he understands... First of all, let's be clear. The judge didn't find it was infrequent. He understands your argument and he says, even if it was infrequent, it doesn't matter. That's what he said. Anything else? No. Okay. Thank you. Good morning, your honors. Attorney Kurt Bruderle for Gary Weimer Jr. May it please the court. Your honors, I'll be brief and remind you who my client is. Gary Weimer Jr. was a minor participant in this conspiracy. He pled guilty to the indictment without the benefit of a plea agreement. That indictment named him solely in the conspiracy count to which he pled and named him only in one overt act, the scrapping of a 2002 Peterbilt semi stolen from Daleville, Indiana, a mere few days before the conspiracy was essentially shut down by the government. After filing objections to the written PSR as to the loss amount and number of victims that were calculated in his guideline range, the court had multiple hearings on the issues. And eventually overruled said objection and calculated my client's guideline range to be at 25 with a criminal history category of 2 for a range of 63 to 78 months, eventually sentencing him with a downward variance of 48 months. Am I right to cut to the chase here that your argument really is he's only charged with being involved in a theft that's one truck and you can't look at the evidence in connection with the other defendants to determine whether he played a more expansive role in this conspiracy. Is that basically it? To a certain extent, Judge. I believe that argument isn't whether he was a part of the conspiracy or not. He pled guilty. He performed an act that was definitely in furtherance of one of the portions of the conspiracy. The argument is that the district court failed to make those specific findings to actually give your honors the ability to review the record to know exactly why he applied the full upwards of $3 million worth of loss to this particular defendant. Mr. Mijas cited the Sweeney case and I'll also reflect to the guideline comments to the relevant section of the guidelines that indicate the scope of sentencing conduct is much different and much more narrow than the scope of when a court determines guilt or culpability as to the whole of the conspiracy. Essentially that is our argument, that the district court failed to make those specific findings in order to hold him responsible for the entirety of the conspiracy. And then the second argument... Is there any question if we do look at the record from the other defendants that the record does in those cases support a much more extensive role for your client in this conspiracy, assuming what the evidence in those trials are to be believed? To be honest, your honor, I don't know. My client did not participate in the trial. We didn't have the opportunity to cross-examine or challenge those witnesses. I believe it would show that he had some additional involvement, yes. Not the least of which is what his own father testified, right? I don't know if Mr. Weinberg Jr. testified, but yes, in his 302s that were mentioned by Special Agent Cruz during one of our sentencing hearings, he did indicate that he was brought into the conspiracy earlier. However... He's the guy that once they cut this stuff up, he took the stolen things to the local scrapyards. I would disagree with that, your honor. On one occasion... Okay, let me put it another way. His father said that was what the role was of his own son. Perhaps during the trial, your honor, but Special Agent Cruz during the sentencing hearings when asked that specific question could not calculate what my client's role was when he joined the conspiracy. And furthermore, he could not provide the court or counsel with a percentage of value that he contributed to the conspiracy. And we would argue that that which is contained was in that sole overt act of $15,000. That is a significant departure than the more than $2.5 million loss amount that was attributed to him. What the district court essentially did, though he indicates he was not applying the Pinkerton rule, essentially did just that. And it logically follows that because his scrapping of the 2002 Peterbilt was done a mere few days before the conspiracy was shut down, if that is indeed his specific jointly undertaken criminal activity, mind you, the only one that the government was able to put a loss amount to, and the only specific truck that they were able to attribute to my defendant's conduct, and there was no further action by any member of the conspiracy after it was scrapped, that $15,018 mark should be the loss amount in which my client should be held attributable. And that would greatly reduce it from a 63 to 70-month range down to a 2 to 8-month prison sentence. So what do we do with the testimony of Gary Wimmer Sr. and Diana Vannes, V-A-N-N-E-S, and the testimony of the officers that your client confronted them when they were attempting to conduct physical surveillance, which is before this incident you're talking about, and the testimony that when they stole a trailer of diamond-plated steel that your client kept some of it for his personal use? What do we do with all that? Do we just ignore that? Judge, if I may respond, please. I would ask this court to review the record and to see, for those specific instances that Your Honor points out, what was the value? What was the loss? I don't believe this court can find what the value and loss for those specific actions actually was. Of all the items that loss amount was attributed for sentencing purposes, not for guilt, Your Honor is absolutely correct. That would imply that he is guilty of the conspiracy, but on a more narrow front when determining sentencing. Those actions were not given loss amounts. The only action that was... Again, you want only specific loss amounts, and then you want to add them up, where the judge said, hey, these are the record shows, whether the judge said it or not, these are all the things that the record shows he did, so your guy got the entire amount as what was foreseeable, right? The argument is that it wasn't foreseeable. I understand that, but that's what your guy got. The judge found it was foreseeable. Assuming the judge is right about that, you don't go back and then parse out the values of just certain transactions if, in fact, the conclusion is right that everything was foreseeable. Your Honor, I would say that both Sweeney and United States v. Jenkins, United States v. Orlando, and United States v. Meacham require that finding of what is the jointly agreed upon criminal activity, and then a further analysis for sentencing purposes only would require that court to find what are the acts of this specific individual, which it would already have done, and what are the actions of the other co-conspirators that contributed to that specific jointly undertaken criminal activity. And I don't believe the government... One other question that nobody's gotten to yet. Apparently this judge used a loss table that he had prepared, and that loss table and gathering was available for everybody at the time of sentencing? Yes. So I think it's probably a good characterization of the record that in some instances the judge didn't say, and I'm finding A, B, C, D for each defendant. Let's assume that he didn't. But he's relying upon the loss table. Doesn't that replace the words that you are suggesting is missing here in the judge's findings? Respectfully, Your Honor, I don't believe so. Tell me why not. Rule 32. Rule 32 requires that in United States v. Gull, those cases and that authority requires the judge to make those specific findings in order to then make the determination of relevant conduct and reasonable foreseeability. What I'm asking you is why is not the loss table that the judge prepared a finding? I would argue that it is a finding, Your Honor, but it should be specifically attributed. The loss amounts in that table should be specifically attributed to each individual defendant. There is a requirement by, I believe it is from the Sixth Circuit, from this court, that requires a differentiation between co-conspirators resulting in an individualized finding effect for each defendant. And that again flows from the Jenkins, Meacham, and Orlando case line, which the district court just didn't do. All right. Thank you. Thank you. Good morning, Your Honor. My name is Dan Hurley, and I represent the United States. With the court's indulgence, I'll go in the same order the defendants did, starting with Gary Weimer Sr.'s Rule 29 motion. To the extent I understand his argument, he's essentially suggesting that aiding and abetting and a conspiracy conviction are mutually exclusive, and that's simply not correct. Special Agent Steve Jackson testified that Gary Weimer Sr. admitted, I'm storing stuff, I'm crushing stuff. That's being part of the conspiracy. He knew that his brother was stealing these items. He helped his brother. He let him store things there. He took the trucks apart. They moved items back and forth. He let his brother use his rollback. It's essentially a large open container that's a trailer. All of those are actions that show he is signing on to this common venture. Whether or not he said out loud, I formally hereby agree to join your conspiracy, the jury was entitled to infer that he had in fact signed on by virtue of his actions. There's nothing more that's required under the law, and so his conviction should be sustained. His argument that theoretically aiding and abetting can be different than a conspiracy, that's correct, is it not? There are different theories of liability, yes. The conspiracy is the agreement. Here you're saying that it shows a conspiracy. It not only shows aiding and abetting, but it also shows conspiracy. That's right, Your Honor, and I think jury can infer that he has reached this mental agreement by virtue of the fact that over and over again, he's taking steps to help them succeed in their venture. As to the insufficiency of the evidence, we'd have to find that a reasonable juror could not so find, based upon the reasonable inferences, right? That's right, and I don't think any juror could make that finding because over and over again, not only did he take those steps, he admitted, I knew what was going on and I was trying to help him. That's enough for a conspiracy. Unless there are any other questions, I'll move on to Terrence Weimer. Terrence Weimer argues that his sentence was substantively unreasonable, and one of his grounds was that he had no criminal history. That's actually not correct. He had four criminal history points, but the judge thought the criminal history was overstated, so he reduced him to criminal history category one, but Terrence Weimer did, in fact, have some criminal history. More importantly, his primary argument seems to be the comparison with his father. I did misstate the father's sentence. It was 40 months, not 48 months, but the district court has no obligation to equalize or harmonize those sentences, and when one looks at the record, Terrence Weimer was far more involved in the conspiracy. He played much more of an instrumental role. In fact, he wore a number of different hats. He was cutting things with a torch. He was transporting items. He was cleaning up. He was doing all sorts of things to help the conspiracy succeed. Under those circumstances, a sentence of 60 months, identical to what several other people who played similar roles, such as Earl Beebe, got, is absolutely appropriate and certainly not an abuse of discretion. With respect to can the insurance companies be victims, I think the case law is clear. If I understand his argument, Mr. Weimer is suggesting that somebody ate the loss. The truck was destroyed and somebody paid money, and to the extent he's suggesting that it can't be the insurance company because they're just a pass-through for the premiums paid by the policyholders, well, then the people who ate the loss are the policyholders, each of whom were paying premiums. They didn't file claims, but their premiums subsidized the payout for the drivers who did suffer losses. Well, now we have way more victims. That's not the way the guidelines work. The insurance companies that wrote the checks to the owners of the stolen vehicles are clearly victims under the law, unless there's any other questions on that issue. Theoretically, could the policyholder and the insurance company both be victims for the same loss? I don't think so. I think that the economic reality is the insurance company is a stand-alone entity, and their balance sheet at the end of the year is going to show they either paid out on this claim or they didn't, and so they suffered the loss, and I don't think there's any reason to start looking behind the antecedent transactions to see who ultimately lost. The policyholders paid in money for coverage. They got the coverage. The insurance company wrote a check on the claim. They suffered the loss, so they're the victim, and there's no reason that they can't be the victim, along with the drivers, to the extent the drivers also had to pay deductibles, had tools, had clothing, had personal articles stolen. That's where I thought you were going to go. I thought the law was that the insurance company can be a victim if they had to pay out, and even if somebody got reimbursed by the insurance company, they can still be a victim if they can show additional loss, which could even include the delay in getting reimbursed from the insurance company if they can show they were injured because of that. That's right, Your Honor. And all of the drivers that testified, they all had personal articles in the vehicles or in the cabs. The trailers all had straps. They have giant chains and binding systems to hold down loads of cargo. All the drivers indicated they had those things. They have to produce them or provide them. Those were stolen when the trailer was stolen. They had jackets. They had duffel bags. They had CD players. They had radios. Did they provide their insurance? Apparently, most of them claimed they were not. They lost the use of the truck. Was that covered by insurance? Usually it's not, which is why many of the drivers in that table indicated that they had lost wages because they were unable to work for some period of time. And that's why one of the company owners, I believe it was Randy McCombs, said when two trucks were stolen, right away two drivers were out of work because there was nothing for them to drive. That's clearly a loss. Now, it is true that the district court did not put a dollar value on some of those losses. That particular claim is exactly why we have the Bostick Rule. If Mr. Curt had stood up and said, Judge, you can't count them as victims if you don't give them a specific dollar amount and increase the loss total line by line, the district court could have said, okay, I'll give each a dollar. And then that issue wouldn't be here. But the reality is the court found that each of these victims identified in that chart suffered pecuniary harm. Lost wages, lost personal property, lost economic opportunity. Whether or not the court says it's $1, $1,000, whatever, to the extent that's an error, that's to his benefit because the loss amount is thereby lower. Just so I don't forget to ask you this question, you're not really at this point in the argument, but you've alluded to this loss chart. Yes. And a couple of the defense counsel have indicated that the loss chart isn't an effective substitute for an individualized finding of loss as to their client because the loss chart doesn't say which defendants were involved in which thefts. So how do you respond to that? Under the relevant conduct guideline, they're responsible for if they are part of the conspiracy. The problem here is the district court didn't say out loud at the front end. I find that except for Anthony Weimer, who was in jail for part of this, and Robert DeBolt, who for other reasons the government chose not to ascribe the earlier losses to him before the charge conduct, the court didn't say out loud. Everybody else was in there from the start. But that's clearly what was going on. That was the clear approach taken by the probation department, and that's the approach taken by the court, and that's what the evidence showed. So was he required to say that, in which case we need to remand, or wasn't he required, and if not, why not? I don't think so, Your Honor, because it's clear from what the district court said and did that that was his finding, that the defendants were involved from start to finish. There's nothing in this record, as to any of these five defendants, that they weren't involved. The testimony from start to finish was... They don't have to prove anything. They don't, but when Greg Rose, when Sean Weimer, when Gary Weimer Sr., when all of the statements, the post-arrest statements, the proffers, the trial testimony, says this has been going on for years, and these guys have all been in on it, and everyone was in it, everyone did this, they showed up at various points. They're in it, and there's nothing to suggest they weren't in it. And I understand they don't have to prove it, but when Greg Rose, for example, says, we've been doing this for years, starting at two previous locations, then those defendants are in the conspiracy, unless there's some reason to think they're not in the conspiracy. So you're basically saying it was implicit in what the judge found in connection with some of the sentencing? Yes. Yes. That the judge... And what would be your best argument there? Maybe the amount of restitution, or the total amount of the loss? The loss amount that the court found. The court specifically says at the end of that chart, Anthony Weimer is not responsible for the losses that occurred when he was in jail. Robert DeBolt is not responsible for the period before the charge period. And by implication, everybody else is responsible for those, and the court at the time of sentencing for each defendant specifically addressed the guidelines. He said to each defense attorney... Is your argument that he didn't have to make the finding, or is your argument that he did impliedly, or is your argument harmless error? My argument is that he implicitly made that finding when he said to defense attorney, each defense attorney, your client's guidelines are 78 to 97. Your client's guidelines are 63 to 78. I find an offense level 25 criminal history category 1. I find offense level 27 criminal history category 2. That is a finding. That's a finding that that's what the guideline is, and he's reaching that by adopting the chart that holds each defendant responsible for the amount in the conspiracy. Perhaps it would have been clear if the court added a column to the chart that said which defendants are covered for this period, but I think that this court's understanding was consistent with what the agent testified to, which is they were all in it from start to finish. And if they're all in it, except for the two that I've identified, then it's a pointless exercise to list each name over and over again in this extra column. The court clearly took that position when it adopted the guidelines, when it made the findings as to what the guideline amount was. If a defense attorney... He couldn't have made the guideline finding without having previously concluded, whether he said it or not, that they were in it from the beginning and they're responsible for the whole thing. That's exactly right, Your Honor. And, Court, you said it more clearly, perhaps, but I don't think that there's any case that says you have to say it with the utmost of precision. It's clear what he did by making these guideline findings. And, again, as you alluded, Judge McKee, what is the point of this? The evidence is overwhelming that all of them were involved. The idea of asking for a remand when the court asked them, is there anything I haven't said? Is there anything I haven't done? At no point did any defendant stand up and say, Judge, you have not sufficiently articulated exactly what period of involvement is ascribable to my client. So he asked the Bostick question. He asked the Bostick question. Are you claiming plain error applies to this particular question? I am, Your Honor. And they can't show an effect on their substantial rights because the district court not only wouldn't make a finding to the other direction, it couldn't because the evidence is so strong. So there's no point in remanding for this empty gesture. I don't want to squirt any other questions. On that issue, I'd move to Robert DeBolt. The pre-sentence report recommended that Mr. DeBolt not get acceptance or responsibility. The court discussed it at length with Mr. DeBolt's attorney. The court said that it wasn't going to be about the fact that he was late because he was on a smoke break. It was because, as the panel recognized, he wouldn't meet with the probation officer. He also wasn't honest with the probation officer. He wasn't honest with the FBI. And each of those factors weighs heavily in the finding of acceptance or responsibility. Mr. Tabelman's argument is this statement about I'm not going to take that into account came at the end, in the actual imposition of the sentence. When he denied acceptance, according to Mr. Tabelman, that's what he was the basis of the denial of acceptance because he hadn't disavowed using his unhappiness with the defendant at that point. So how do you respond to that? The district court did not say you were late and that goes to acceptance. He did talk about all of these factors. He talked about you wouldn't meet with probation. And there was actually discussion on two days about that issue. It came up earlier and then it came up again on the Monday when all the defendants were sentenced. The court did not, when he was discussing acceptance, at no point did the district court say and I'm so offended you were late coming back to court. What he said was you wouldn't meet with a probation officer. So really there's three steps here. The guy's late, the judge chastises him. He then makes the finding on acceptance. You say he didn't refer to being late at that point. He then imposes sentence at the end and he disclaims utilizing being late as a factor. Is that the way it went? I believe there was a brief reference to the fact that Mr. DeBolt was late at the time the court was deciding the question of acceptance. But it was a passing reference in conjunction with the bigger issue which was Mr. DeBolt's lawyer said look he pleaded guilty. And the district court said well he pleaded guilty the morning of trial the jury was here and that's untimely and that is a factor that the court can consider. My recollection is that there was a reference at that point to the fact that Mr. DeBolt was also late in returning to court. But the district court went on to talk about the more important factor which was Mr. DeBolt didn't meet with the probation officer and that's a significant issue for the district court. The district court made clear at no point did the district court say you're being late returning to court is why I'm not giving you acceptance. What the district court said was you didn't meet with the probation officer. You're not candid about what you did. You're still not being candid about the extent of your involvement in this conspiracy. Yes you pleaded guilty but you pleaded guilty the morning of trial and that may not standing alone be enough for me to conclude that you had acceptance that you accepted responsibility for what you've done. In conjunction with each of those other two factors that's more than enough. This court has to give special deference to the district court because of the importance of that face-to-face contact and there's nothing in the record that would suggest that this court was acting irrationally, punitively or in any way unfairly. It was about the failure to meet with the probation officer. It was about the failure to be honest about what he did and both of those factors were discussed the previous week. So Mr. Jones first raised this issue the previous week when the agent was testifying and the district court was dealing with factual issues and at that point the failure to come back in a timely basis from a smoke break hadn't happened yet. The district court the previous week had already said up forward you didn't meet with the probation officer you're not being honest about what you did. You pled guilty morning of trial. All of those reasons were in the record and talked about as reasons why Mr. DeBolt would not get acceptance or responsibility. At that point we said why don't we wait let him allocute and the court can make a final decision at that point. But it's not true that he was late from the smoke break the district court then decided not to give him acceptance. This was all well developed the previous week. Unless the panel has any other questions on Mr. DeBolt I'd move to his brother John DeBolt. Mr. Mehas suggests that John DeBolt was only involved on a couple of occasions. That's just not true. Again, Greg Rose said it couldn't have been more clear they were doing this all along. They were doing it at Bill's City Auto they were doing it on Sterling. This was a pattern for years. Sean Weimer testified that John DeBolt was the first person they went to to help. He was a torturer he had skills that they didn't necessarily have and they knew they could trust him to keep his mouth shut because they'd done this on previous iterations before Mr. Weimer went to jail on his most recent tour. John DeBolt was involved from start to finish. Mr. Mehas suggests well he was only in camera a couple of times but that's not the standard. The testimony made clear John DeBolt was in it from start to finish and because he was in it from start to finish it's fair to attribute to him all of those losses. Mr. Mehas keeps talking about what was foreseeable. If you are personally involved then under the guidelines you never get to reasonable foreseeability. That's a red herring here because John DeBolt is being held accountable for his own role in cutting off the stolen trucks and trailers. He was there he was cutting wire he was taking off the sheathing he was cleaning the bits of the VIN numbers and things of that sort. He was involved in a substantial and extensive way. He's not being held accountable for things that other people did that may or may not have been foreseeable to him. He's being held accountable for what he did. I mean if he only worked on 5 vehicles and they have 35 vehicles I mean he's held accountable because it's reasonable and foreseeable that the conspiracy is more than he's actually worked on himself, right? It's true, Your Honor, but there's nothing... Foreseeability is relevant, isn't it? I don't think it's necessary here and the reason is that there's nothing to suggest John DeBolt only worked on 5 vehicles. Well, I mean, I don't know. Did he work on every vehicle that they chopped up? That's the clear implication from the testimony of Greg Rose. When Greg Rose... He may not have, but I don't know. You say he did. He worked on every vehicle that was part of the conspiracy. Greg Rose testified that every time Mike Weimer stole a truck we'd come into work. And the we was Greg Rose and John DeBolt because they were partners. I just think as a general rule a conspirator doesn't have to personally be involved in every stage of the conspiracy as long as he's part of it, as long as he's part of the agreement. I agree. Okay, so I don't want to establish a rule that a conspirator can only be held accountable for his actual conduct, his actual participation, even though he knows it's going to be more than that. I agree, Your Honor. I was just suggesting that the issue Mr. Meehaus is raising you don't need to get to. It doesn't apply to him. Okay. You don't need to get to that because under the guidelines subsection A is personal acts and conduct of the defendant and then B is acts of others in the joint undertaking. So we don't have to get to B. You don't have to get to B. All right. But the problem with skipping B is that the judge didn't make a specific finding here with this defendant and with some of the others that he was in fact involved in every truck from the very beginning. He did not explicitly make that finding, Your Honor. I think he implicitly made that finding and the judge did say however frequent he was there but that was not a finding by the district court. That was a response to Mr. Meehaus saying but he's only on camera five times. And at that point the district court said well, even if that's true he's still responsible under the reasonable foreseeability standard. But that was not a finding by the district court. That was simply a response to Mr. Meehaus suggesting he can only be responsible when he's personally observed cutting up a particular truck. But here under either A or B frankly John DeBolt's involved from start to finish. He's a cutter. He's torching vents. He can't possibly suggest he didn't know what was going on or what the scheme was about. And in light of Sean Weimer's testimony there's nothing unfair or incorrect about holding John DeBolt responsible for all of the losses suffered. Unless the panel has any other questions about John DeBolt I'd move to Gary Weimer Jr. Mr. Brutally is focused on the fact that Gary Weimer Jr. was in fact only caught on film in possession of stolen property on that one date when they took the identifiable pieces in early February. The problem for Mr. Brutally's argument is that his client was a part of the conspiracy long before that. His client admitted that he helped shovel for example there was a trailer full of aluminum shavings just cut up very small pieces of aluminum and it went on for days shoveling. They tried to get the front loader in it. There was so much material they didn't know what to do with it. And Gary Weimer Jr. admitted he was there helping to put the aluminum shavings into individual sized boxes that they would then take. Gary Weimer Jr. took loads to the scrap yards according to his own father repeatedly. His father said look he did what I told him to do that was his role I would have him take it. So the father says I would have him take these stolen items to the scrap yard. So it's simply not true that Gary Weimer Jr. was only involved in February. Gary Weimer Jr. was involved again start to finish. He may not have been the first one in but he was in all along. There was specific evidence that talked about he was he got the diamond plating he was working at the Sterling Street location. Each of those facts shows he's a member of this conspiracy and for a member of the conspiracy he's responsible. This is one defendant for whom the reasonable foreseeability does come into play because he was primarily at the console location. But he was at the Sterling Street location enough that it's a reasonable inference that even when he's not personally handling it he knows what they're doing is within the scope of the joint enterprise. And Gary Weimer Jr. was involved in all of the items at the console location where they're crushing things they're storing things they're cutting up pieces and taking axles and parts of the semi trucks and using them in the items at the Sterling location. Each of those acts puts him in the middle of this conspiracy and so even if there's a particular theft that hasn't been identified where he didn't come to the Sterling location it's part of the joint venture and it's within the scope of what he agreed to do which is to be part of this conspiracy that was going to steal these things chop them into pieces and sell them for scrap. Unless the panel has any further questions I'm happy to rest on our briefs. We do not. Thank you, Your Honor. Thank you, Your Honor. Regarding this distinction between the law of conspiracy liability and aiding and abetting liability I'd ask the court to look closely at the ethnic casualty opinion that is cited in our brief. Even though it's a civil case the underlying allegations were quasi criminal allegations of fraud against a bank officer to assist a general contractor in defrauding an insurance company. The jury returned verdicts for finding the bank officer liable for aiding and abetting the fraud and conspiracy to commit the fraud. And it's significant because on appeal this court reversed the jury finding on the conspiracy theory, affirmed the jury verdict with regard to the aiding and abetting liability and the court stated that while the bank officer's conduct certainly assisted the contractor in the fraud, the court stated it was unreasonable for the jury to further infer that the bank officer agreed to join in the fraudulent scheme. Your argument as I understand it is you have a client who by  make you a member of the conspiracy. Is that the argument? You claim all your guy was an aider and abetter to some of the things they did but not a member of the conspiracy. I would say that sums up our argument. There is a  question about the insurance companies and whether they should be victims. There was some talk about whether the drivers were considered victims or the truck owners. Clearly they are. They are the primary victims. My argument to the court is that an insurance company voluntarily or contractually is just not a victim for what the sentencing guidelines are intended to achieve. It distorts the picture and leads to an improper sentence. Likewise, I want to disagree with the characterization that my client Mr. Robert DeVolt waved in the argument about the loss amount determination. He had a chart with a different number. The judge did not directly rule on that at  sentencing hearing itself. In that instance, the judge asked him what authority he had for the information on the chart. He didn't tell him    for the information on the chart. The chart lists specific vehicles and values with vehicles. The government's chart lists specific vehicles and values with vehicles. It's true he didn't say I'm challenging theft number one. If you look at the chart, the judge said what's your authority for that? What is your basis for those amounts? I don't think he ever answered that, did he? He had retained an expert who had gone to a third party source. The expert came to court to testify that he would substantiate those numbers. He wasn't just picking numbers out of the air. He provided that to probation. For whatever reason, the judge didn't accept that estimate of that value. There's no explanation for that. I think the difficulty that we find today is that   make specific findings. As the government admits, there's an implication and we don't know what that implication is. We don't  what that implication is. When it comes to incarceration, it should be specific in what the court does. The government cites Greg Rose's testimony and advocates for what was said. What we should be seeing is the  of what we face here. The government brings up Bostick here that if the articulation was inadequate, you have an obligation to object. Is this a Bostick case where there was no objection and therefore we review for plain error? I don't think so because repeatedly the court gave the indication that one objection counts for everybody. I think it was very stated in the court. All these matters were objected to and preserved. Correct. Sounds to me like you were arguing articulation. Yes. That is more of a procedural reasonableness issue which goes to Bostick as opposed to the inadequacy of the articulation and that is what Bostick is about. I don't think Bostick applies because I think the court several times assured counsel both during trial and sentencing that one counsel's objection whether in our objection I don't think you are understanding the point. You had to have made objections and if the understanding was one objection applies to all, that is fine. That means you did preserve it in the sense that you objected to it. We don't hold you to complaining about what the judge does with that up front because he hasn't done it yet. The judge then imposes the sentence and you say the judge is obligated to make certain findings. Bostick then requires you to come back and say we objected. When you ruled on the objection judge you didn't do what you were required to do. You are supposed to do that at the end so if there is something correctable on the issue  supposed to do that. You see the difference? I see the difference but during the sentencing hearings these objections statements were  saying your honor we do need to have specific findings. We do need to have an articulation to each individual. It didn't happen. If there is a ruling against you you preserve the issue and appeal it but here you are arguing that there was not a ruling and there is a sentence and there is articulation without it and that is a correctable error. That's what Bostick is about. I think that was asked by several counsel to correct. Do you  is a reason why the sentence was imposed? I cannot confirm that. Thank you. Gary Brooderly. The government focuses on when he entered the conspiracy. It matters not for the sake of guilt. What matters is the actions and the loss amount the government chose to present to the court. I ask you, what was the loss value of that? It is not reflected in the transcripts. What was the loss amount of that? What was he a victim of? It is not reflected in the transcripts. I ask you, what was the loss amount of  It is not  the transcripts. What was the loss amount of that? It is